May it please the Court, my name is Mark Robinette. I'm here representing the plaintiffs and the appellants, Karen Wernley and Don Powers. Now I would like to discuss today three things if I have time to get to them, but the first one is the District Court's decision that the plaintiffs were not entitled to the protections of the First Amendment because according to the District Court they were speaking in their official capacity as employees when they contacted the state's education agency and discussed their concerns that the school district's administration was violating a federal regulation in implementing section 504 of the Rehabilitation Act and this decision that they were acting in their official capacity was despite the fact that when they were not expected to do so and they did it without the knowledge of any of their supervisors or superiors. I mean intuitively that just it's hard to get there. I mean intuitively somebody's in their job, they're doing their job, they're in the school, they become aware of this because of their job. I mean it's not like they're at home, they're sitting on the sofa or whatever, where to inadvertently. So I mean intuitively, I know you're going to go into the factors, but I mean intuitively to say that a principal and a vice-principal they become aware of all of this and so forth to then kind of dichotomize and say well this is private because nobody directed you to do it. I mean maybe that's what the law says and what you're going to argue, but intuitively unlike other cases that we have, sheriff's deputies, other people, etc., who sort of arguably stepping out of that when they say these things, but these people are in the milieu of the school environment, etc., etc. So disabuse me of my intuitive. That's the situation is that the case law states both from the Supreme Court and from this circuit court that just because you become aware of information as a result of your employment, the fact that you then talk about that information does not mean that you are doing so pursuant to your employment. And the question is not how you become aware of information. In fact, the courts have stated that in cases involving education, the best people to become aware of improper activities are the educators and they should be encouraged. It's not dispositive that you learn the information through your employment, but isn't that just one factor among several that we can consider under the case law to determine whether they're acting privately or as an employee? Well, and the determining factor is whether the action of the discussion or the report is in the capacity of one's employment. And in this case, was the, was it the TEA, I think you mentioned, is the TEA the natural designated agency or entity to receive such complaints from educators? It is the chief educational entity in the state of Texas that oversees education of every school district. I mean, it's part of the schematic that's set up by the Texas legislature for the administration of the schools. Is that correct? Well, yes. And if an employee has wrongdoing to report, that would be the natural place to take it as opposed to like the Texas Rangers or the FBI. Or a local TV station or a news reporter or any other. Because those entities do not have the expertise that the TEA has to say, you're right, we'll do something about it or you're wrong. We won't do anything about it. But the big concern in this case, as a matter of First Amendment speech, is that the plaintiffs had a right to bring it to the attention of the TEA. And the reason they had the right to bring it to the attention is because the case law says, and in fact the Anderson case out of this circuit court makes it clear, that the key factor is whether the communication is one that the employer had the right to control. Whether the employee is doing something that the employer has a right or whether it's appropriate to say, you can say this, you cannot say that. And if their employer has no right to control the communication, then it's not made in their official capacity as an employee. They were the Adams Hill administrators on the 504 committee, correct? Correct. And I assume that the communications involved internal management of those 504 practices. Why is that a matter of public concern at that point? Well, you're talking, what they contacted the TEA about was a violation of federal law, violation of a federal regulation. In other words, how taxpayer money is being spent? Are we spending it to enforce the federal statute on the Rehabilitation Act, or is somebody not sure? Well sure, you're talking about the Garcetti principles under the First Amendment. And you remember that Garcetti was a law enforcement officer, and he was upset with the way it's being administered, if you will. But what happens, of course, is that he was acting pursuant to his responsibilities internally when he went to others about that particular unlawful search. And of course, the Supreme Court told us in Garcetti that that is simply outside the reach of it. And here you have 504 committee people, teachers, doing that, and they go to the state agency that administers that. I've been complaining about it, complaining about violations, whatever. We're talking about the Fourth Amendment, Garcetti. So help me with why Garcetti doesn't control. Well, this was an action taken outside of the agency. It was not something that was pursuant to part of their duties. In fact, according to this court's decision, the key factor is whether the speech was subject to the control of the employer. It absolutely was not. In fact, there's a law in Texas that prohibits the employer from interfering with the right of an employee to report unlawful conduct. It's called the Texas Whistleblower Act. And if you take a look at the records excerpt on page 71, this court made a decision in this very case on interlocutory appeal where this court stated that the school district claims that it is clear from plaintiff's own testimony that they were not reporting an actual violation of law. That's what the school district claimed. They were seeking validation of their prior actions for the purpose of protecting their jobs in light of the serious allegations they were facing. Powers and Wormley respond that their testimony reflects that they reported Section 504 violations. The district court rejected NISD's argument, noting that a jury, not the court, is best equipped to make the credibility determination resolution of that argument requires. And so this court did not interfere with the district court's finding on that matter, that it was a question of fact as to whether they were reporting a violation of law or whether they were reporting something for their own self-interest. Now how someone can be a whistleblower, at least the district court held, that there was enough there to carry this case over for a trial on the whistleblower violation and yet at the same time not be enough to support an action for free speech is something that I think is outside the scope or at least it's almost impossible. I had said in the brief that we filed that how do you justify the fact that someone is a whistleblower reporting the state's violation of a law, which is a matter of public concern every time it's reported, with the fact that it's not done in or with matter that there's an allegation that it is done in accordance with the official duties. Now I thought of an example that might help clarify the situation. For example, if Mr. Powers or Ms. Wormley were the district's public relations coordinator and they were charged with sending out press releases, that's part of their job, and in their press release they say something like the district did real well in testing this year, but then added, but by the way, the administration violated the section 504 of the Rehabilitation Act and doing so that would make the administration pretty unhappy if that was out there in the public or if a copy of that was sent to the state education agency, and in that case the district might be able to claim that issuing that press release with information they had the right to control and regulate to its own platform was something that they could sanction the employee for. In that case the employee would have acted in furtherance of their official capacity, furtherance of their official duties. You have the Texas Whistleblower Act, and there was an allegation that they were retaliated against for the, and I take it, that for their the same conduct going to the state agency itself, is that correct? Is that the whistleblowing activity you're talking about? Well the Whistleblower Act protects any public employee. I understand that, but my question is on the fact of this case. You tried to the jury the whistleblower retaliation issues under the Whistleblower Act as I understand it, correct? Well the retaliation issue was never reached. Well what happened? Well the court asked a jury to reach that issue. What did they decide it on? Well it was decided on the fact that the jury held that they were not making a good-faith report of a violation of law under the statute the way the statute defined a good-faith report, and that ended the inquiry. Now the fact we disagree, and in fact that's one of the things we have an appeal here, we think that as a matter of law it was a good-faith report, but whether or not that controls, it does not apply at all to the First Amendment argument. The First Amendment does not require a report of violation of law. It requires just a discussion of matters that you have a right to discuss as a private citizen, no matter where you receive your information from that you're discussing. And what was the purpose of going to the state agency? The purpose of going to the state agency was that there was a child who was being denied, in the opinion of my clients, the reasonable accommodations for his disability. And the school district was not allowing those reasonable accommodations, and so they went to Texas Education Agency to report that in our opinion, the school district is not following the law. And this PEA at that point would have the right to investigate the situation, and to take actions, and in fact impose sanctions, although that might not be likely, but they could at least say this is the way you need to do it, school district, if in fact you are not following the regulations. Well, I thought that the contact with the Texas Education Agency was confirmation that they had interpreted their obligations correctly. Their contact was to convey to the Texas Education Agency that the school district was not following their legal obligations, which is a matter of public concern. Well, what precipitated that was the school district telling them that we're not doing so, and they then went to the state agency to confirm that they were correct. No, they went to the state agency, and yes, it would be nice if the state agency had confirmed that they were doing it right, but the main point was to make sure that it did get done right after contacting the agency, not simply to confirm something. If the agency said they're not doing this correctly, the agency could then correct the situation by contacting the school district. So what relief do you seek for that? The relief is remand for a trial on the free speech issue. But what relief do you seek for that? What relief do you seek for that? Well, the relief is reinstatement to their employment, because their claim is that they were discharged because they exercised their right to free speech. Well, as I read the record, there were a couple other problems that your clients had. One was a concern that assertedly repeated rebranding of the cheerleader team and the creation of private banking accounts to evade a directive that the cheerleader program needed to be disbanded. Here, why does that buttress the finding that Powers' termination was in good faith? Well, and my clients have the right to a fair hearing in which they can show that those allegations were pretext. They were brought up. They were created as part of a, quote, witch hunt to try to find a reason to reach a predetermined result. Why didn't the whistleblower action that you had an opportunity to trial, why didn't that vindicate or not your right? Because that issue was never reached. Well, that's because the jury poured you out before they got to it. Yes, and that issue is different than the issue in a free speech case. How is it different? You're arguing that, okay, all that I read, there were allegations against your clients about improperly exercising their job responsibilities vis-a-vis special ed students, et cetera, without the appropriate guidelines and so forth, and then there was information about them shredding documents and all this other kind of stuff that was there. So you're saying all of that was pretextual in response and retaliation for this report? That's correct, and my clients have a right to present those facts that show their to a jury and let a jury determine were those pretexts or were those real valid concerns. Okay, thank you, sir. You've reserved your rebuttal time. All right, Mr. Wood. May it please the court. Thank you for the privilege this morning of representing the Northside Independent School District and Dr. Brian T. Woods in connection with this matter. Northside's the fourth largest school district in the state of Texas with a school population of 106,000 students, and Dr. Brian T. Woods served last year as the state superintendent of the year and was also one of four finalists for the national superintendent of the year. Why did you tell us that? I want to tell you that, Your Honor, because of the fact that these folks are—I'm proud to be here on their behalf and also because of the fact that this is not an unsophisticated school district. This is not a little school district where the people are not trained, don't have any understanding of procedures, don't have any understanding of processes, because processes are going to be very important to this discussion. Judge Hickenbotham, you have correctly recognized that Garcetti does indeed control this case, and there are two huge obstacles—actually, there are three huge obstacles to the plaintiffs recovering in this—or to the plaintiffs seeking the relief or obtaining the relief that they seek in this case under the First Amendment. The court has taken note of the factual history. One of the most significant parts of the factual history was that initially the first indication that there was a problem at all was in June of 2013, and a 504 coordinator for the district was reviewing paperwork related to the STAAR test, and she realized that a student was going to be given oral administration of the STAAR test even though they had never been provided any types of services in 504. They had never been admitted to 504, and importantly, they had never received any type of response to intervention. Now, you might say, well, what's the problem with giving somebody an accommodation that maybe they don't need? And I think if you look at that, it's pretty self-evident. The goal is to teach them the skill. I think of the illustrative example of if a kid comes into kindergarten and can't tie their shoes, it certainly would be possible for the teacher to say, well, Jimmy doesn't need to tie his shoes because anytime they're untied, I go and tie them for him. And then the next year in first grade when he can't tie his shoes, the problem arises again, and somebody asks about it, and they say, well, his first grade teacher tied them for him, and they say, well, we're providing him an accommodation. In fact, we send somebody out to recess or to the lunchroom with him. The goal is we should be teaching Jimmy to tie his shoes. We never tried any responses to intervention with respect to the student, JB, before just indicating that we were going to move him into 504 and provide this oral administration of the assessment test. Now, that's problematic, and she pointed out that that was problematic. It seemed as if there was some intent to circumvent or game the system. The scores at Adams Hill Elementary where these two people were administrators were problematic, and they knew that. And the 504 program was problematic, and they had been informed of that. The record is very clear with respect to those issues. When she discovers this, she advises them that she is about to undertake an audit of the 504 files, which she immediately does, of all the 504 files on that campus. They are told at that point, they are called in and placed on administrative leave. They're told not to interfere with the investigation, not to contact or communicate with anybody related to the investigation. At that point, they did several things, and the independent hearing examiner, I'll get to that process in a moment, but the independent hearing examiner found that they began to engage in some very egregious behavior. They began to manipulate documents. They shredded documents. They destroyed electronic files. They created new files to suggest that they had been in place before, and they backdated those files. They obliterated information. Later, you'll find that in the record also that they communicated with people to talk about the investigation, and there were some other issues, but this is all going on, and the administration is meeting with Mr. Powers and Ms. Warnley and trying to get input from them and trying to explain to them that you have just done this completely wrong. You have not followed any procedures at all. We can't understand, and now as we look in your file, we see that you've been admonished about the fact that you're not following the 504 procedures. Ms. Powers apparently reaches out to TEA, and she says exactly what Judge Higginbotham recognized, and there are a number of quotes and citations from their testimony, both deposition testimony and the deposition testimony that was brought prior to our motion for summary judgment, but she says, I'm reaching out to TEA to try to get some help. I'm trying to get them to validate that I've done this the right way. She even asked if there's somebody who can intervene with the district on her behalf to explain that she's done this the right way. Same thing for Mr. Powers, and that's what you see in the record. She is very much within the context of trying to maintain her employment and acting as an employee of the district, trying to get some assistance. This is very much like reaching out to somebody within the organization during the course of bringing an internal grievance. She's looking for validation. He's looking for validation, and again, there are numerous examples cited in our brief, so I know that the court has read those, and that's the nature of communications with TEA. They keep talking about reporting a violation of law. The testimony largely is about this getting assistance, but I want to talk about the violation of law separately in a moment. So while this is going on, they're given their opportunity to speak to the district to explain their procedures, but they're told, you have not done this correctly. What you're telling us is not right. That's not the way 504 is handled, and ultimately, the superintendent looks at this situation and he says, look, you're not giving me an adequate explanation or an appropriate explanation, and you don't seem willing to acknowledge that the procedures have not been appropriately followed. If you could acknowledge that the procedures are not appropriately followed, then perhaps we could remediate this issue, whatever, but there's just a steadfast refusal to take that responsibility. Anyway, the culmination as the investigation goes on, the stuff like shredding documents, backdating documents, that's coming to the surface, mistakes on 504 procedures. This is actually an affirmative attempt to cover up the actions that took place, and then there are other things that are uncovered during the investigation, like the fact that Mr. Powers was told not to continue a cheerleading program on his campus, and yet he did nonetheless. So as all of these facts, all these fairly egregious circumstances are brought to the attention of the superintendent, the superintendent says, this is not somebody that we can have in these are not the standards. I mean, one of the things that we teach kids is that you got to follow the rules with respect to the test. The procedures on these tests are, you know, are very regulated, they're very strict with respect to the rules. If the teachers are not going to follow the rules, then how can we expect the students to learn from them that that is something important? So in assessing the entire situation, Dr. Woods makes a recommendation to the Board of Trustees. The panel, the judges are aware that in Texas we don't simply fire a Chapter 21 educator, a Chapter 21 employee. What we do is we make a recommendation. So Mr., Dr. Woods made a recommendation to the Board of Trustees that the board propose the termination of Mr. Powers and this is months after the fact and they've been on paid administrative leave the entire time and they continue to be on paid administrative leave throughout this process. But they were given notice and the board did indeed vote to propose the termination. And when that happens, the educator has the right to request a hearing before an independent hearing examiner within the state of Texas, not somebody within the Northside Independent School District, but they have the right to go to TEA and say we want you to assign an independent person to come down and conduct a full evidentiary hearing with respect to whether or not good cause exists for the termination of our employment. And both Mr. Powers and Ms. Warnley elected to take that option. And so in March of that next year, and keep in mind we talk about the allegations arising in June, in March of the next year after full discovery, after being represented by council, after giving their depositions and having the opportunity to take depositions, do interrogatories, the full-blown opportunity that we would get in a standard state court trial or federal court trial, they appeared before an independent hearing examiner and for four days testimony was provided with respect to the allegations against them. At the conclusion of that, the independent hearing examiner made findings of fact, he made conclusions of law, and he made a recommendation to the board of trustees that the board terminate both of their employment relationships based upon the fact that there was good cause. The findings of fact are consistent with what I've articulated this morning, cheating, gaming the system. In fact, if you read the independent hearing examiner's opinion, you'll probably be hard pressed to find an independent hearing examiner's opinion that is more scathing with respect to how egregious the conduct of the particular educators was. That recommendation, those findings from the independent hearing examiner were taken back to the board, and then the board of trustees, the seven trustees from Northside Independent School District was presented those findings of fact, those conclusions of law, and the recommendation of the independent hearing examiner. They heard argument from representatives for Mr. Powers and Mr. Wernley. They heard arguments from representatives for the administration, and then they voted to, excuse me, terminate the employment of both individuals. One of the huge hurdles with respect to the relief that appellants seek today is the fact that that good cause finding stands. It is res judicata. They may not attack that good cause finding. They had the opportunity to. They filed an appeal to the commissioner of education, and that would have allowed them the opportunity to articulate that there was some sort of irregularity with respect to the procedures, that somehow the independent hearing examiner didn't consider evidence that he should have, or considered evidence that he should not have, or any other kind of error that they might have chosen to complain about. There really wasn't any, and I think that's evident in their voluntary withdrawal of that particular case. They then instituted this case, but from that point on, at the point that they voluntarily non-suited their state, their appeal to the commissioner, they were bound with the findings of fact made by the, and our brief articulates the support for that, they were bound with the findings of fact, they were bound with the conclusions of law, and they were bound with the recommendation that the independent hearing officer made. Now, one of the things that, one of the questions said, that was asked was, what is the difference between the free speech issue that was not tried in front of Judge Sparks, and the whistleblower issue that was tried? Well, frankly, there's not. I mean, there's really not. If you think about it, it's the same telephone calls. Now, they're focusing very much, they're focusing very much on the fact they're saying that they're making complaints about law, about violations of law, about misapplication of 504 towards this student, JB. But the calls, I mean, you can see from the context of the briefing of both parties what was said in the calls, and in fact, Judge Sparks notes in his ruling on our motion for summary judgment that they really don't address that issue very much, that it very much appears that it is seeking relief on their own behalf. They complained that we cherry-picked the portions of their deposition, and then they say, and by the way, we were reporting a violation of law. Judge Sparks was correct when he ruled on the First Amendment issue. He was correct in the sense that they were speaking in their professional capacity, and that's not protected under Garcetti. Even if they were, the court, this court could reach the same result in the sense that they were not speaking on a matter of public interest. They are talking about their personal employment. We cite a number of cases with respect to the proposition that when you're talking about internal grievances and how this relates to my job and my employment and am I going to get fired, that's a matter of personal concern, not public concern. We also cite cases for the proposition that they never went out and broadcast to anybody in the public that Northside Independent School District misuses 504, misapplies 504, is spending money with respect to 504 in a way that's not appropriate under the statute. They don't make any of those kinds of statements. They make these statements, these particular statements, only to TEA, and we would suggest that those are very much self-focused, focused with respect to their own interest and not with respect to the interest of the public at large. And then the other thing that is going to be a hurdle here is that we have a jury finding with respect to the complaint as to whether or not the school district took any action with them with respect to complaints about violations of law. They got to try that whistleblower complaint in full and they articulated to the jury that they had made these calls to TEA and the things that they had told TEA including that they had reported that 504 was being violated and the jury did not buy it as the court has already recognized. The jury poured them out at the first question and there's no dispute that that question was an appropriate one submitted on whistleblower claim. Did the defendant, did each defendant, separate questions for Mr. Powers and for Ms. Wernley, did each defendant make a good faith report of a violation of law to an appropriate law enforcement agency? And the evidence was overwhelming to the jury and the jury's conclusion was unanimous that they did not. And so it is very clear that the jury did not believe that they had reported some sort of violation of law and that violation of law had resulted in some sort of retaliation. They just did not find that there was a report of a violation of law. In the last point in appellant's brief, they addressed the issue of that particular thing. I do just want to note for the court that obviously there was no motion for judgment at the end of the presentation of error with respect to that finding of the jury. Therefore, this court reviews it based upon plain error. There has to be no evidence to support the finding. It's very clear that there was significant evidence in the record, the court has seen this, that it appears that they were reaching out to try to defend their own positions, not reporting violations of law. They talked about getting an advocate or some representative to come and appear on their behalf within Northside to help them save their job. And so we think that the evidence then is supportive. It's clear that there is evidence to support the finding of the jury. Based upon that and the issues that have been addressed by counsel, I will yield for questions. Well, I guess we had the qualified immunity piece there, but it's in your brief. I don't know if you want to talk about it or not. Yeah, I think the qualified immunity issue, I think really all the other issues are throwaway issues. Qualified immunity, it's very clear under the Culberson case that this is not clearly established law. Culberson was actually decided after this series of events and after Dr. Woods made his recommendation. So clearly at the time that he acted, it was not clearly established law that he would have been exposed to some purported violation. And again, in this instance, I think he is particularly distanced from that because he makes his recommendation to the board. And I'm not saying this by way of insulation. I'm saying that the hearing examiner, who has no dog in the hunt, as we say in Texas. I think you all say that here in Louisiana also. And the independent hearing examiner conducts a full evidentiary hearing and then renders his decisions. And so that decision, that is so remote that it's clear that Dr. Woods could not have had any exposure to liability under the law as it existed at that time. All right. Thank you. We ask that you affirm. Thank you, sir. Back to you, Mr. Robinette. You know, first there are no throwaway issues, but I can't discuss them all in 15 minutes or the five-minute rebuttal. I asked the court to read the issues carefully, which are clear that the plaintiffs do not believe they have ever had a fair opportunity to try their case. The district court said what the defendant just claimed, that the hearing examiner's findings were conclusive. Well, you have. I hope. This all started in September of 2013. We're in December of 2019. Correct. Been a lot of layers of proceedings and procedures and on and on and on. He, counsel opposite, says, well, I guess it's April 2014, the ruling of the commissioner, which was voluntary dismissal of that appeal, the non-suit. So what's your position on the consequences, if any, of non-suiting that appeal vis-a-vis the issues that are out there? The appeal to the commissioner is based on substantial evidence, which what everyone knows is just a scintilla. So at the administrative hearing, all the school district had to do was put on a scintilla of evidence that my clients committed these terrible things that Mr. Wood has just told you about. And my clients did not have an opportunity to put those in context, to show that they were retaliatory, to show they were brought in bad faith. In fact, the hearing examiner made this clear during the hearing itself, and this is on page 63 of our record excerpts. The hearing examiner himself says, the TEA hearing examiner review of a decision to terminate is an extremely, the authority of the hearing examiner is extremely limited. For example, we know the substance of law is that the hearing examiner does not have what in other areas of law is called pendant jurisdiction. It cannot resolve the legitimacy of some other claim or a whistleblower claim or something else, including a free speech claim. The issue is very small. It's very focused, whether or not there's good cause to support the decision taken by either a principal or an administrator or the board at whatever level these decisions happen. So the hearing examiner was limited to hearing simply the allegations and considering the allegations and the evidence against my clients. The hearing officer was not interested in hearing my client's explanation as to how, when these particular deficiencies were brought to their attention, they were not deficiencies that normally would have a job. The hearing examiner was not an adversary proceeding, you're saying? Your client's positions were never part of the hearing examiner's considerations? Well, the hearing examiner did not. I thought it, I don't want to get you bogged down, but I thought it was a, it said, made findings of fact and conclusions of law and so forth, which led me to believe that that was based on a sort of full presentation of all the evidence and so forth. I'm not trying to bog down and text the proceedings. It was based on all the evidence. I was just trying to understand it. Yeah, it was based on all the evidence brought against my clients. My clients did not then, and they have not had a chance in district court, to show that those complaints were not valid. Okay, let me ask it this way. Did your clients opt not to present their side and evidence in that proceeding such that that was all there was, or are you saying the procedure itself disallows your clients to have done it? Well, the proceeding itself disallowed the hearing examiner from considering evidence of the district's bad faith, and that's what my clients are here today seeking is an opportunity to be able to explain their position in context to show that, hey, the district was never going to fire us for these things. In fact, they had to an incident with a directive about a cheerleader club that is not found on record excerpt page 61, and it is used as a basis for terminating their employment, and in and of itself, it shows that not much thought was put into this. It was simply, the district was simply grasping at straws. This memorandum, which my client, Mr. Powers, supposedly violated, stated that I suggest the past to be open to all children, no tryouts, and for next year, I would drop or redo the whole club, and then they claimed he violated the directive by not dropping the club. Well, the memo itself suggests that there's going to be a next year. It doesn't suggest that he has to drop the club right now, but he was fired because he didn't drop the club right now. They are grasping at straws. A directive that is going to result in someone's termination doesn't say you may do this or that and then violate them because they didn't do the one that you preferred, and as a matter, as a normal matter, if someone is going to be fired for a violation of a directive that is very serious, they'll be told it's that serious instead of waiting three years or however long it was to say you haven't complied. They would be dealt with immediately, so we do not feel that my clients have had a full and fair hearing on their claims of the district's wrongdoing, and that's what we're asking for in a remand to the district court for a hearing and a trial on the First Amendment issue. All right. Thank you, Mr. Barnett. Thank you, Mr. Wood. Thank you. The case will be submitted.